# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

MARLENE COLEMAN-SCRUGGS,

Plaintiff,

v.

(1) UNITED STATES OF AMERICA;
(2) ST. JOHN MEDICAL CENTER, INC.;
(3) TULSA RADIOLOGY ASSOCIATES, INC.;
(4) ANDRA DALE NUZUM-KEIM,

Defendants.

Case No. 6:23-cv-131-JAR

**OPINION AND ORDER**

Before the Court are two motions for summary judgment filed under Fed. R. Civ. P. 56 by defendants St. John Medical Center, Inc. d/b/a Ascension St. John Medical Center ("SJMC"), [Dkt. 153], and the United States of America (the "Government"), [Dkt. 155].[1] Plaintiff Marlene Coleman-Scruggs opposes both motions, [Dkt. 162; Dkt. 164], and each movant has replied, [Dkt. 170; Dkt. 169]. Because the motions arise from the same course of events and rest on overlapping evidence, the Court addresses them in a single Order, although it considers each on its own record and arguments. By consent of the parties [Dkt. 37], and pursuant to Fed. R. Civ. P. 73(a) and 28 U.S.C. § 636(c)(1), the undersigned United States Magistrate Judge exercises complete jurisdiction over this action through trial and the entry of final judgment.

---

[1] For clarity and consistency herein, when the Court cites to the record, it uses the pagination and document numbers assigned by ECF.

## I. STANDARDS OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court's task at this stage "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249). In making that determination, the Court must view the evidence "in the light most favorable to the opposing party." *Id.* at 657 (citations omitted). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* at 586.

Where, as here, the nonmoving party bears the burden of proof at trial, the movant may carry its initial burden by pointing to a lack of evidence on an essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). The burden then shifts to the nonmovant to set forth specific facts, by reference to the evidence in the record, from which a rational trier of fact could find in her favor. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). A

party's own testimony, if based on personal knowledge and setting forth specific facts, may suffice: "virtually any party's testimony can be considered 'self-serving,' and self-serving testimony is competent to oppose summary judgment." *Greer v. City of Wichita, Kan.*, 943 F.3d 1320, 1325 (10th Cir. 2019). Conversely, a nonmovant "may not evade summary judgment by speculating about possibilities or hypotheticals that have de minimis to no support in the record." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1205 (10th Cir. 2022). Material facts in the movant's statement "may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant." LCvR 56.1(e).

Under the Federal Tort Claims Act (FTCA), the Government is liable for the negligent acts or omissions of its employees "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, in accordance with "the law of the place where the act or omission occurred," *id.* § 1346(b)(1). *See United States v. Olson*, 546 U.S. 43, 44-46 (2005). The alleged acts and omissions of both the United States Department of Veterans Affairs ("VA") and SJMC occurred in Oklahoma, and the parties agree that Oklahoma law governs plaintiff's negligence claims against both movants.[2] Under Oklahoma law, a plaintiff asserting medical negligence must establish "(1) a duty by the defendant to protect the plaintiff from injury; (2) a failure to properly exercise or perform that duty, and (3) the plaintiff's injuries are proximately caused by the defendant's failure to exercise his

[2] Plaintiff's claim against the Government will be tried to the Court. *See* 28 U.S.C. § 2402. The Court's role as the ultimate factfinder, however, does not permit it to resolve credibility disputes or weigh conflicting evidence on the paper record at summary judgment.

duty of care." *McKellips v. St. Francis Hosp., Inc.*, 741 P.2d 467, 470 (Okla. 1987). "Expert testimony is required where the fact in issue is not within the realm of ordinary experience of mankind," *Strubhart v. Perry Mem'l Hosp. Tr. Auth.*, 903 P.2d 263, 274 (Okla. 1995) (citations omitted), and is "ordinarily necessary to establish causation in professional liability cases," *Boxberger v. Martin*, 552 P.2d 370, 373 (Okla. 1976); *see also Roberson v. Jeffrey M. Waltner, M.D., Inc.*, 108 P.3d 567, 569 (Okla. Civ. App. 2005).

## II. UNDISPUTED MATERIAL FACTS [3]

### A. THE SCREENING MAMMOGRAM AND SJMC'S COMMUNICATIONS WITH PLAINTIFF

On April 30, 2021, plaintiff underwent a screening mammogram at SJMC in Tulsa, Oklahoma on referral from the VA. [Dkt. 155, ¶ 1; Dkt. 164, ¶ 1]. The radiologist's report noted that "[a] new 1.1 cm spiculated mass is near the 1-2:00 position of the left breast posterior depth," documented "Additional Imaging Evaluation is Needed," and recommended "[f]urther evaluation with targeted ultrasound of the new left breast mass." [Dkt. 155, ¶ 2; Dkt. 164, ¶ 2]. A screening mammogram with that result, classified as BI-RADS 0, is not diagnostic; it indicates additional imaging is required before any diagnosis can be made. [Dkt. 155, ¶¶ 41-42; Dkt. 164, ¶¶ 41-42]. SJMC transmitted the radiology report to the VA within one

[3] Because the two motions rest on overlapping records, the Court has combined the parties' statements of material facts and the responses thereto, [Dkt. 153 at 3-5, ¶¶ 1-12; Dkt. 162 at 2-4, ¶¶ 1-23; *id.* at 4-6, ¶¶ 13-23; Dkt. 170 at 1-3, ¶¶ 1-6; *id.* at 3-6, ¶¶ 7-17; Dkt. 155 at 3-10, ¶¶ 1-47; Dkt. 164 at 3-9, ¶¶ 1-47], into a single narrative limited to facts material to the summary judgment motions. Where a material fact is disputed, the Court so notes and, consistent with Rule 56, views the evidence in the light most favorable to plaintiff as the nonmoving party.

day of the examination.[4]

SJMC's records reflect a lay letter and a separate patient reminder letter were printed on May 3, 2021, and the notification was reprinted on May 16, 2023. [Dkt. 170-2]. According to defendant Andra Dale Nuzum-Keim, M.D., SJMC's lay letters are generated automatically by the breast center's proxy system and sent by regular mail, without certified delivery, tracking, or any mechanism to confirm receipt. Dr. Nuzum-Keim could not say whether plaintiff received the May 3, 2021 letter. [Dkt. 162-5 at 11-12 (87:22-88:5), 13-17 (90:18-94:8)]. Plaintiff testified she did not receive it and first saw it during this litigation in 2023, although it bore her correct post-office box address, which she had used since 2016. [Dkt. 162-2 at 10-13 (65:11-68:18)].

Plaintiff received a different letter from SJMC in late June 2021.[5] She found the letter "confusing" because she could not tell whether it concerned a completed or a scheduled mammogram and because it included language about disregarding something, and she testified it did not tell her the April 30 study had shown findings requiring additional imaging. [*Id.* at 4-5 (57:9-58:9), 12-13 (67:11-68:8)]. After receiving the letter, plaintiff called the listed SJMC telephone number. According to plaintiff, SJMC scheduled follow-up imaging, then canceled the appointment, told her she did not need to worry, and said someone would call her back. [*Id.* at 4-7 (57:9-60:25)]. A VA record states the July 1, 2021 mammogram appointment "was canceled

---

[4] [Dkt. 153, ¶ 8; Dkt. 162, ¶ 8]. Plaintiff disputes this fact only insofar as it characterizes Dr. Scuderi's opinion as establishing that SJMC met the standard of care for notification. She does not dispute the report was provided to the VA within one day. *See* [Dkt. 162 at 7].

[5] [Dkt. 162, ¶ 16; Dkt. 170, ¶ 10]. SJMC's reply refers to this correspondence as the "May 31, 2021 letter." The discrepancy does not affect the Court's analysis.

by the clinic," and plaintiff testified the cancellation came in a call from SJMC. [Dkt. 155, ¶ 7; Dkt. 164, ¶ 7; Dkt. 162, ¶ 20; Dkt. 170, ¶ 14]. According to plaintiff, in approximately October or November 2021, an SJMC scheduling employee called and told her, during the breast center's move from St. John Hospital to the Mary K. Chapman facility, she was one of several patients who "fell through the cracks" and whom SJMC had failed to call back. The scheduler arranged an appointment for January 27, 2022. [Dkt. 162-2 at 8-9 (61:2-62:18)].

### B. THE VA'S COMMUNICATIONS AND POST-NOTIFICATION EVENTS

VA nurse practitioner Julia Salmon, APRN-CNP, received the results of plaintiff's abnormal screening mammogram. [Dkt. 155, ¶ 3; Dkt. 164, ¶ 3]. The VA's records include a letter dated May 7, 2021, documenting NP Salmon notified plaintiff by telephone that day of the results and of the recommendation for a left breast ultrasound. The letter further states plaintiff's follow-up diagnostic ultrasound would be delayed to the first week of July to account for her recent COVID-19 vaccination. [Dkt. 155-2 at 1]. Plaintiff denies having the May 7, 2021 telephone call, denies receiving the letter, and denies any post-mammogram discussion with NP Salmon about the result or the need for follow-up, and she testified her telephone records and contemporaneous recordings made at her home that day support her account. [Dkt. 164-2 at 10-20 (71:18-82:6)]. NP Salmon could not identify any returned certified-mail receipt, did not know what happened to such receipts, and could not verify that plaintiff received the correspondence. [Dkt. 164-3 at 6-14 (20:23-28:21)]. NP Salmon also testified she was unaware of the July 1 cancellation. [*Id.* at 18 (65:21-24)].

An order for a left breast diagnostic ultrasound was written on May 7, 2021,

was later canceled, and expired on October 18, 2021. The Government attributes the expiration to plaintiff's failure to complete the follow-up testing, while plaintiff points to inconsistent cancellation entries in the records, including one entry incorrectly stating the completed April 30 mammogram had been canceled and another stating the July 1 appointment "was canceled by the clinic." [Dkt. 155, ¶ 4; Dkt. 164, ¶ 4].

Plaintiff's radiology expert, Gaelyn Scuderi, M.D., identifies in her report several VA administrative actions which, in her view, contributed to the delay in plaintiff's diagnosis: a letter from the VA's Care in the Community team ("NVCC"), issued after unsuccessful attempts to contact plaintiff, advising her authorization for services would be canceled if she did not contact the team within fourteen days; the decision by VA Radiology scheduling to cancel the diagnostic breast imaging orders as obsolete or expired; and the interval between the NVCC administrator's acknowledgment of the cancellation on October 18, 2021 and notification of the provider on December 26, 2021. [Dkt. 155, ¶ 26; Dkt. 164, ¶ 26]. The report states each action "appears VA policy-driven and is not assessed within the context of the standard of care," but also the actions "appear[] contributory, to the delay in provision of diagnostic breast imaging services, and ultimately, the timely diagnosis of breast cancer." [Dkt. 119-2 at 11-12]. At her deposition, Dr. Scuderi testified a policy canceling authorization after fourteen days would breach the community standard of care; the unexplained October-to-December lapse did not meet the standard of care; the VA provider who electronically acknowledged the cancellation breached the standard of care by failing to follow up on the reasons for it; and the radiology

department breached the standard of care by failing to follow up with the ordering provider regarding the cancellation. [Dkt. 155-10 at 6 (82:2-84:23, 85:16-25), 7 (90:17-24, 91:14-92:9), 8 (96:14-97:15)].[6]

### C. Diagnosis and Treatment

On January 27, 2022, plaintiff underwent a left breast ultrasound at SJMC, which showed a 1.4-centimeter suspicious mass in the left breast at the 1-2 o'clock position and one lymph node with cortical thickening suspicious for malignancy. A biopsy performed the same day revealed invasive ductal carcinoma of the left breast and metastatic carcinoma in a left axillary lymph node. [Dkt. 155, ¶¶ 8-9; Dkt. 164, ¶¶ 8-9]. On March 3, 2022, plaintiff's breast surgeon, Dr. Lauri Flynn, performed a left lumpectomy and axillary lymph node dissection. Pathology showed a grade 2 invasive ductal carcinoma measuring 1.9 centimeters and three of fourteen axillary lymph nodes positive, all with macrometastatic disease. [Dkt. 155, ¶¶ 12-14; Dkt. 164, ¶¶ 12-14]. The pathological stage was T1c N1a, equating to an anatomic and prognostic stage of IIA.[7] Plaintiff subsequently received radiation to the left breast and draining axillary area, and she has developed increasing lymphedema in the left upper extremity and left breast. [Dkt. 155, ¶ 18; Dkt. 164, ¶ 18].

### D. The Expert Testimony

Plaintiff has identified two expert witnesses: Dr. Scuderi and Steven Papish, M.D. [Dkt. 153, ¶ 5; Dkt. 162, ¶ 5; *see* Dkt. 119].

---

[6] The parties dispute whether this testimony elaborates on opinions disclosed in her report or expresses new ones. [Dkt. 155, ¶¶ 28-32; Dkt. 164, ¶¶ 28-32]. *See* Part V.B., *infra*.

[7] [Dkt. 155, ¶ 17; Dkt. 164, ¶ 17]. Plaintiff admits the stage but denies an unchanged stage establishes an unchanged prognosis, tumor burden, lymph-node involvement, treatment, or harm.

Dr. Scuderi, a radiologist, was retained to address whether defendants met the standard of care for timely notifying and communicating with plaintiff about the abnormal results of her April 30, 2021 mammogram. [Dkt. 153, ¶ 6; Dkt. 162, ¶ 6].[8] She testified the Mammography Quality Standards Act (MQSA) regulations distinguish between self-referred patients and patients who have a referring provider: for a self-referred patient, the facility must provide both the lay letter and the results; for a patient with a referring provider, the facility must provide the lay-letter notification to the patient and communicate the results to the referring physician. [Dkt. 170-1 at 2 (34:7-14), 4-6 (39:7-41:21)]. Asked whether SJMC "breached the standard of care in any way, shape or form," Dr. Scuderi answered: "I saw no evidence in my review of the records provided that [SJMC] breached the standard of care in any way." [*Id*. at 10 (107:1-5)]. She agreed her report identifies no breach by SJMC or any of its providers, [*id*. (107:16-20)], and testified SJMC sent the lay letter to plaintiff and notified the ordering provider, [*id*. at 2 (34:15-21), 4 (39:7-25)]. After reviewing additional materials, including the depositions of plaintiff and NP Salmon, Dr. Scuderi testified those materials did not change the fact that she is not critical of SJMC. [*Id*. at 10-11 (107:21-108:4)].[9]

---

[8] The Government characterizes Dr. Scuderi as retained to opine on the standard of care applicable to the primary care services provided to plaintiff at the VA. [Dkt. 155, ¶ 19]. Plaintiff states Dr. Scuderi was retained to address notification and the continuum of care from screening through diagnosis. [Dkt. 164, ¶ 19].

[9] Dr. Scuderi conducted a cursory review of plaintiff's deposition the night before her own deposition. [Dkt. 162-1 at 3-5 (8:13-10:9)]. Plaintiff also relies on Dr. Scuderi's statement that certain conduct was "ultimately detrimental" to plaintiff and "directly contributed to a cascade of events leading to a delay in diagnosis." [Dkt. 162, ¶ 8 (citing Dkt. 119-2 at 11)]. SJMC contends this passage addresses NVCC's decision to delay follow-up imaging because of plaintiff's COVID-19 vaccination, not conduct by SJMC. [Dkt. 170, ¶ 5]. The Court does not rely on this passage in resolving SJMC's motion.

With respect to the VA, Dr. Scuderi's report states:

> The VA provider notified the patient of the abnormal screening interpretation and the need for additional breast imaging evaluation. The details of the telephone encounter were documented in a letter written in lay language and sent to the patient. Verbal and written notification of abnormal screening mammography results to the patient within seven days meets or exceeds the standard of care.

[Dkt. 119-2 at 9 (emphasis omitted)]. At her deposition, Dr. Scuderi confirmed this conclusion rested on NP Salmon's chart entry. [Dkt. 155-10 at 9 (109:14-19)]. Plaintiff was deposed before Dr. Scuderi submitted her report, and Dr. Scuderi did not review that deposition before doing so. [Dkt. 155, ¶ 22; Dkt. 164, ¶ 22]. Asked whether plaintiff's deposition changed her opinion, Dr. Scuderi testified:

> It did not because, you know, I have no expertise on her phone records … I'm simply making that assessment based on medical records reviewed, which I feel like reviewed medical records falls within my field of expertise. I have no opinion on that.

Dkt. 155-10 at 9-10 (109:20-110:4)]. Plaintiff does not dispute the accuracy of this testimony, but she maintains Dr. Scuderi did not authenticate NP Salmon's account or opine on credibility and instead assumed the chart entry was accurate for purposes of her analysis. [Dkt. 164, ¶ 25 (citing Dkt. 164-1 at 52-53 (109:6-110:4))].

Dr. Scuderi testified an acceptable timeline from an abnormal screening mammogram to a diagnosis of breast cancer is roughly three months, "give or take," generally accounting for approximately one month between the screening mammogram and the diagnostic examination, one month to six weeks from the diagnostic examination to biopsy, and approximately one week from biopsy to

results.[10] Applying the sequence of care in January 2022, when the diagnostic ultrasound and biopsy were performed on the same day, Dr. Scuderi testified plaintiff most likely would have been diagnosed in June 2021. [Dkt. 164-1 at 26-27 (55:11-56:23)].

Dr. Papish, an oncologist, was retained to assess the effect of the alleged delay on plaintiff's condition, treatment, and prognosis; he offers no standard-of-care opinions or related criticisms of SJMC. [Dkt. 153, ¶¶ 10-12; Dkt. 162, ¶¶ 10-12]. His report compares plaintiff's projected stage, prognosis, treatment, and expected treatment side effects had the abnormality identified on the April 2021 mammogram been further evaluated and a diagnosis established with those following her actual diagnosis on January 27, 2022. [Dkt. 119-1 at 9-13]. Using a tumor-doubling calculator, Dr. Papish concludes "that had a diagnosis of breast cancer been established in 4/2021, [plaintiff] would have undergone a lumpectomy, axillary dissection and radiation to the breast but less likely, radiation to the full axillary area which may have avoided some of the symptoms of lymphedema but these could still occur with an axillary dissection alone." [*Id.* at 12]. He reasons earlier surgery could have involved only one lymph node, in which case "radiation to the axilla is often omitted." [*Id.* at 13]. He further opines plaintiff's estimated ten-year survival rate would have been 89% with the earlier diagnosis, compared with 82% at the time of her actual diagnosis. [*Id.*]. Although Dr. Papish did not opine to a reasonable degree

---

[10] [Dkt. 155, ¶¶ 43-44; Dkt. 164, ¶¶ 43-44]. The parties dispute the significance of this testimony. The Government treats it as fixing the period within which diagnosis was required, while plaintiff characterizes the intervals as approximate, resource-dependent estimates, with the biopsy interval representing an outside range.

of medical certainty that any of plaintiff's lymphedema symptoms would have been avoided, he testified axillary radiation would have been less likely with the earlier presentation and adding radiation increases the risk of lymphedema. [Dkt. 155, ¶ 36; Dkt. 164, ¶ 36].

Dr. Papish further testified that his opinions assumed surgery would have occurred in April or May 2021. He explained he used surgical pathology to estimate prognosis because final prognosis depends on surgical findings, and the earlier surgery would have occurred several weeks after the mammogram, likely near "the end of May, or somewhere in that range." [Dkt. 164-4 at 6-12 (21:11-27:2)]. He did not estimate plaintiff's tumor size, ten-year survival rate, treatment and associated side effects, or number of affected axillary lymph nodes for a hypothetical surgery in July, August, or September 2021. [Dkt. 155, ¶ 40; Dkt. 164, ¶ 40]. He did, however, testify that the tumor continued to grow throughout the delay and that he used tumor-growth data and the PREDICT model to compare the projected outcome of earlier surgery with the actual outcomes. [Dkt. 164-4 at 14-20 (29:9-35:17)]. He also testified that he generally sees a four-to-eight-week interval between biopsy and surgery. [Dkt. 155, ¶ 46; Dkt. 164, ¶ 46].

## III. PROCEDURAL HISTORY

Plaintiff filed this action on April 20, 2023 against the Government, SJMC, Tulsa Radiology Associates, Inc. ("TRA"), and Dr. Nuzum-Keim, a TRA employee. [Dkt. 2].[11] She alleges no defendant communicated the results of her April 30, 2021

[11] TRA and Dr. Nuzum-Keim have not moved for summary judgment, and the motions at issue do not address plaintiff's claims against them.

mammogram to her, in violation of the MQSA, and this failure allowed her cancer to grow, necessitating more extensive treatment, surgery, and radiation than would have been required had the results been timely communicated. [*Id.* ¶¶ 7-8]. She seeks $7,500,000.00, together with interest and costs, for past, present, and future medical expenses; past, present, and future physical and mental pain and suffering; disfigurement; and permanent loss of enjoyment of life. [*Id.* ¶ 9; *id.* at 3]. Plaintiff's claim against the Government arises under the FTCA, 28 U.S.C. §§ 2671-2680, and she alleges that she presented notice of her claim on May 19, 2022. [*Id.* ¶ 10].

The Government moved to dismiss, for lack of subject-matter jurisdiction, any claim based on alleged post-notification acts or omissions by the VA. [Dkt. 146]. The Court denied the motion. [Dkt. 166]. Under the operative scheduling order, motions in limine were due by August 28, 2026, [Dkt. 141], and proposed jury instructions must be submitted by November 20, 2026, [Dkt. 165]. As of the date of this Order, the following motions in limine remain pending:

- SJMC's *First Motions in Limine*, seeking, *inter alia*, to preclude plaintiff from divulging at trial the existence of (i) SJMC's motions in limine and any responsive rulings; (ii) prior lawsuits or claims against SJMC; (iii) any claims, theories of liability, exhibits and/or witnesses not included in the Pretrial Order and/or not disclosed in discovery; (iv) the financial condition or ability to pay any judgment as to SJMC, or any suggestion plaintiff is struggling to make ends meet; (v) any evidence SJMC was grossly negligent or exhibited a willful or conscious disregard for plaintiff's health and/or safety; and (vi) any medical testimony by unqualified lay witnesses, [Dkt. 139];

- SJMC's *Second Motions in Limine*, seeking, *inter alia*, to preclude (i) plaintiff's experts from referencing, testifying, or in any way relying on improper standards for causation and from making causation arguments based on speculation and conjecture; (ii) plaintiff from redefining the standard of care at trial through terms like "patient safety" or "dangerous conditions"; and (iii) plaintiff's experts from testifying about medical records or literature which were not relied upon in forming their opinions during discovery, [Dkt. 140];

- the Government's *Motion in Limine to Exclude Testimony of Plaintiff's Damages Expert, Dr. Steven Papish, M.D.*, seeking to preclude Dr. Papish's opinions at trial in whole, [Dkt. 151]; and

- plaintiff's *First Omnibus Motion in Limine*, seeking, *inter alia*, to preclude defendants from mentioning evidence at trial regarding any prior defendant, dismissals of any prior defendant, any alleged negligence of any third parties, and payments from collateral sources, [Dkt. 154].

## IV. SJMC'S MOTION FOR SUMMARY JUDGMENT

SJMC's motion presents a single question: whether plaintiff can establish that SJMC breached the standard of care despite her sole standard-of-care expert's testimony to the contrary. On this record, the answer turns on a genuinely disputed question of fact.

### A. THE STANDARD OF CARE IS ESTABLISHED AND UNDISPUTED

SJMC argues plaintiff must present expert testimony to establish the standard of care applicable to SJMC, SJMC's deviation from it, and causation, because those matters are not "within the realm of ordinary experience of mankind." [Dkt. 153 at 8].[12] Because Dr. Scuderi testified SJMC met the standard of care by providing the radiology report within one day and saw no evidence of any breach, and because Dr. Papish offers no standard-of-care opinions at all, SJMC contends plaintiff cannot prove the second element of her negligence claim. [*Id.* at 8-9]. Plaintiff responds that

[12] SJMC relies on *Jones v. Mercy Health Ctr. Inc.*, 155 P.3d at 13-14 (Okla. 2006); *Akin v. Mo. Pac. R.R.*, 977 P.2d 1040, 1054 (Okla. 1998); *McKellips*, 741 P.2d at 470; *Strubhart*, 903 P.2d at 274; *Boxberger*, 552 P.2d at 373; *Harder v. F.C. Clinton, Inc.*, 948 P.2d 298, 305 n.30 (Okla. 1997); *Matchen v. McGahey*, 455 P.2d 52, 57 (Okla. 1969); *Williams v. Safeway Stores, Inc.*, 515 P.2d 223, 227 (Okla. 1973); *Edwards v. Chandler*, 308 P.2d 295, 297-98 (Okla. 1957); *Pine v. Rogers*, 77 P.2d 542, 543 (Okla. 1938); *Maples v. Bryce*, 429 P.2d 741, 743 (Okla. 1967); *Reed v. Scott*, 820 P.2d 445, 448-49 (Okla. 1991); 12 O.S. § 2702(A); and OUJI 14.1-14.2. [Dkt. 153 at 6-7]. SJMC also invokes the Court's gatekeeping obligation under Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and the principle that an expert qualified in one field may not offer opinions in another. [*Id.* at 7-8]. SJMC does not, however, challenge the qualifications or reliability of any expert in its motion.

SJMC conflates two different communications: transmission of the radiology report to the referring provider, and the facility's separate obligation to communicate directly with the patient. [Dkt. 162 at 7-8]. She further argues Oklahoma law requires expert testimony on medical questions beyond ordinary experience but does not require an expert to recite a talismanic conclusion once the standard is established, citing *Strubhart* and *Boxberger*. [*Id*. at 8].

SJMC is correct that, under Oklahoma law, a plaintiff must ordinarily present expert testimony to establish the standard of care applicable to a health-care provider and the provider's departure from it. *Strubhart*, 903 P.2d at 274. That requirement exists because the governing professional standards and their application typically lie outside the "realm of ordinary experience of mankind." *Id*. Here, the content of SJMC's patient-notification obligation is neither obscure nor disputed. The MQSA regulations in effect in 2021 required each facility to "provide each patient a summary of the mammography report written in lay terms within 30 days of the mammographic examination[.]" 21 C.F.R. § 900.12(c)(2). The regulations separately address communication with the referring provider. *See id*. § 900.12(c)(3). Dr. Scuderi confirmed the facility's patient-notification obligation, [Dkt. 119-2 at 8-9, 14; Dkt. 162-1 at 6-13 (34:3-41:21)], and SJMC not only admits the regulation but affirmatively relies on Dr. Scuderi's testimony that, when a patient has a referring provider, the facility must both provide the lay-letter notification to the patient and communicate those results to the referring physician, [Dkt. 170, ¶¶ 7-8]. Rachel Franklin, M.D., an expert witness for the Government, likewise states the standard

of care requires results and follow-up recommendations to come "directly from the facility performing the testing." [Dkt. 121 at 5].

The record thus contains expert testimony—which SJMC itself embraces—identifying the facility's obligation to send the patient a lay summary within thirty days independent of its transmission of the report to the referring provider. SJMC's prompt transmission of the report to the VA bears on the latter obligation, *see* 21 C.F.R. § 900.12(c)(3), but does not by itself establish compliance with the former, *see id.* § 900.12(c)(2). SJMC does not argue otherwise; its reply instead maintains it satisfied both obligations. [Dkt. 170 at 9].[13] The dispositive question, then, is not what the standard of care required, but whether SJMC complied with it.

### B. WHETHER SJMC SENT A TIMELY LAY SUMMARY IS GENUINELY DISPUTED

On that question, the record points in different directions. SJMC's evidence consists of a records entry showing a lay letter and a reminder letter were "printed" on May 3, 2021, and testimony that such letters are generated automatically and sent by regular mail. *See* [Dkt. 170, ¶ 9]. Plaintiff's evidence consists of sworn testimony that she never received the May 3 letter at her correct post-office box and first saw it during this litigation; the absence of any certified delivery, tracking, or confirmation of receipt; Dr. Nuzum-Keim's inability to say whether plaintiff received the letter; plaintiff's testimony that the only SJMC letter she received arrived in late June 2021—outside the thirty day window—and did not tell her the study required

[13] The Court need not decide whether the MQSA regulation independently defines the standard of care under Oklahoma law, because plaintiff's expert has testified to the obligation it describes and SJMC does not contend the standard of care required anything less.

additional imaging; and the SJMC scheduler's later statement that plaintiff was among the patients who "fell through the cracks" during the breast center's relocation, which plaintiff contends is a party-opponent statement under Fed. R. Evid. 801(d)(2)(D). *See* [Dkt. 162, ¶¶ 15-18; *id.* at 8-9]. In plaintiff's view, whether a letter was mailed or received, whether its language conveyed an abnormal result, and what SJMC told her are predicate facts the factfinder can determine without expert assistance.

Proof that a properly addressed letter was placed in the care of the postal service gives rise to a rebuttable presumption it was received. *See Witt v. Roadway Exp.*, 136 F.3d 1424, 1429-30 (10th Cir. 1998). But whether SJMC's evidence of automated printing and routine mailing establishes this particular letter was in fact mailed, and whether plaintiff's testimony and the surrounding circumstances rebut any resulting inference, are questions requiring the weighing of evidence and the assessment of credibility. Those tasks belong to the factfinder, not the Court at summary judgment. *Tolan*, 572 U.S. at 656-57; *Anderson*, 477 U.S. at 249. Although Dr. Scuderi did not opine that the standard of care required SJMC to track its lay letters or guarantee their receipt, the obligation at issue is to *send* the lay summary. Plaintiff's testimony that the letter never arrived is circumstantial evidence of whether SJMC sent it, which the factfinder may consider alongside other evidence in the record.

Nor do the authorities SJMC cites permit the Court to disregard plaintiff's testimony. SJMC argues plaintiff "cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another," *Seastrunk v. United States*, 25 F.Supp.3d 812, 815 (D.S.C. 2014) (quotation omitted), and, where medical records and physician testimony show the care at issue occurred and was appropriate, a plaintiff cannot create a fact question merely by stating otherwise, *see Dulaney v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). [Dkt. 170 at 7-9]. But plaintiff does not stack inferences; she testifies from personal knowledge about what she did and did not receive at her mailing address. That testimony is competent summary judgment evidence notwithstanding its self-serving character. *Greer*, 943 F.3d at 1325. *Dulaney* is likewise inapposite: there, inmates sought to contradict medical records and physician affidavits documenting treatment with their own assessments that the treatment was inadequate. 132 F.3d at 1240. Plaintiff offers no lay opinion on the adequacy of medical care. Rather, she testifies to a historical fact within her personal knowledge—her nonreceipt of the letter—while SJMC's records establish only that a letter was printed, not that it was mailed.

### C. DR. SCUDERI'S ULTIMATE OPINION DOES NOT ENTITLE SJMC TO JUDGMENT

SJMC's strongest argument is that Dr. Scuderi, having reviewed plaintiff's deposition, continues to testify SJMC did not breach the standard of care. [Dkt. 153 at 8]. Plaintiff contends Dr. Scuderi's ultimate notification opinion rests on disputed record entries rather than proof SJMC mailed a compliant notice, and a factfinder may accept Dr. Scuderi's description of the governing standard while rejecting the disputed assumptions underlying her case-specific conclusion. [Dkt. 162 at 9-10]. The Court has carefully considered Dr. Scuderi's testimony but concludes it does not

resolve the dispute described above.

An expert opinion is only as sound as the facts on which it rests. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Dr. Scuderi's conclusion that SJMC met its obligations depends on the premise that SJMC sent the lay letter—a premise drawn from SJMC's records. And in explaining why plaintiff's deposition did not alter her parallel opinion concerning the VA, Dr. Scuderi candidly acknowledged she was "simply making that assessment based on medical records reviewed" and had "no expertise" regarding evidence outside those records. [Dkt. 155-10 at 9-10 (109:20-110:4)]. Whether a facility mailed a particular letter is not a matter of medical judgment; it is a historical fact of the kind factfinders routinely determine. Once expert testimony supplies the standard—here, the facility must send the patient a lay summary within thirty days—a factfinder that finds SJMC sent no such summary within that period would need no further expert assistance to conclude the standard was not met. Oklahoma law requires expert testimony on matters beyond ordinary experience, *Strubhart*, 903 P.2d at 274; it does not make an expert's acceptance of one party's version of disputed historical facts binding on the factfinder.

For the same reason, Dr. Scuderi's testimony that her opinion remained unchanged after reviewing plaintiff's deposition does not render the underlying dispute immaterial. Materiality is determined by "the substantive law," *Anderson*, 477 U.S. at 248, not by a witness's assessment of the evidence. Under the standard Dr. Scuderi herself described, whether SJMC timely sent the lay summary

determines whether SJMC breached its duty, and that fact is therefore material. Dr. Scuderi's reliance on SJMC's records in the face of plaintiff's contrary testimony is a proper subject for cross-examination and goes to the weight of her opinion; it does not remove the question from the factfinder. Viewing the evidence in the light most favorable to plaintiff, a reasonable factfinder could find SJMC did not send plaintiff a lay summary of her abnormal results within thirty days of her examination. SJMC is therefore not entitled to summary judgment on the ground plaintiff cannot establish breach.

### D. SJMC'S REMAINING CONTENTIONS ARE RESERVED FOR ITS PENDING MOTIONS IN LIMINE

SJMC's remaining arguments challenge the scope of the evidence and expert testimony plaintiff may present at trial. SJMC contends plaintiff's discovery responses identify only a failure to notify and she never supplemented them, [Dkt. 153, ¶¶ 3-4]; Dr. Scuderi's report discloses no opinions regarding SJMC's scheduling and cancellation conduct, so any such opinions would be undisclosed and inadmissible, [Dkt. 170 at 8 (citing *Harris v. Remington Arms Co.*, 997 F.3d 1107, 1112 (10th Cir. 2021))]; and the American College of Radiology (ACR) communication standards apply to interpreting radiologists rather than to facilities, [*id.* at ¶ 7 & n.1]. Plaintiff asserts the scheduling evidence falls within the same failure-to-communicate claim pleaded in her complaint and identified in discovery, and supplementation was not required because the evidence was elicited at her deposition with SJMC's counsel present. [Dkt. 162, ¶ 4 (citing Fed. R. Civ. P. 26(e)(1)(A))].

Because plaintiff's failure-to-notify theory survives summary judgment on the

disputed mailing evidence alone, the Court need not decide whether SJMC's scheduling and cancellation conduct supplies an independent basis for liability or whether any professional standard beyond the MQSA-based obligation SJMC acknowledges applies. The remaining questions—whether plaintiff may offer the scheduling evidence at trial and for what purpose, whether Dr. Scuderi may testify to opinions not set forth in her report, and how the ACR standards may be presented—are evidentiary questions governed by Fed. R. Civ. P. 26(a)(2)(B), 26(e), and 37(c)(1). They are squarely presented by SJMC's pending motions in limine, which seeks to exclude undisclosed claims, theories, and witnesses, [Dkt. 139], to bar plaintiff from redefining the standard of care, and to confine plaintiff's experts to materials on which they relied during discovery, [Dkt. 140]. The Court will resolve them in ruling on those motions, where it can examine the disclosures actually made and, if a violation is found, determine whether it was "justified or harmless" under *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). Moreover, SJMC raised its expert-disclosure argument for the first time in its reply. The Court declines to consider arguments raised for the first time in a reply because doing so would deprive plaintiff of a fair opportunity to respond. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."); *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998); *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). Any remaining dispute about how the jury should be instructed on the

applicable standard of care may be addressed through proposed jury instructions.[14]

The Court expresses no view on how the factfinder should resolve the disputed facts. It holds only that, on this record, SJMC has not shown the absence of a genuine dispute of material fact as to whether it breached the standard of care. SJMC's motion for summary judgment is therefore denied.

## V. THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The Government advances two propositions. First, it argues plaintiff's claim that the VA failed to notify her of her abnormal results fails because (1) her own expert opined the VA met or exceeded the standard of care, and (2) plaintiff lacks expert testimony establishing damages proximately caused by any notification failures. Second, it argues plaintiff cannot establish damages proximately caused by any post-notification act or omission. The Court addresses each in turn.

### A. NOTIFICATION OF THE ABNORMAL SCREENING RESULTS

#### 1. Breach of the Standard of Care

The Government's first argument parallels SJMC's. It contends that, under Oklahoma law, "in all but the extraordinary medical malpractice case, the plaintiff has the burden of producing expert testimony to support a prima facie case of negligence," *Roberson*, 108 P.3d at 569, and that the mere possibility or speculation of fact is insufficient, *see McKellips*, 741 P.2d at 470-71; *Dyco Petro. Corp. v. Rucker*,

[14] Although SJMC's motion states expert testimony is also required to prove causation, SJMC develops its argument only as to breach and does not contend plaintiff lacks causation evidence. *See* [Dkt. 153 at 6-9]. The Court therefore does not address causation as to SJMC. *See* Fed. R. Civ. P. 56(f)(2). SJMC's challenges to the causation testimony of plaintiff's experts are the subject of its second motion in limine. *See, e.g.,* [Dkt. 140 at 7].

443 F. Supp. 685, 693 (E.D. Okla. 1977); *Jones v. United States*, 978 F.2d 1267 (10th Cir. 1992). The Government asserts Dr. Scuderi's sole opinion was that the VA did not breach the standard of care in notifying plaintiff of her results, she maintained that opinion after reviewing plaintiff's deposition, and plaintiff cannot now alter her expert's disclosed opinion by asserting it rests on incorrect facts. [Dkt. 155 at 11 (citing *Cohlmia v. Ardent Health Servs*., 254 F.R.D. 426, 433 (N.D. Okla. 2008); Fed. R. Civ. P. 26(a)(2)(B)(i))]. The Government further contends the factual dispute over notice is not material, *see Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 250; *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993); *Alder*, 144 F.3d at 670; Dr. Scuderi, as plaintiff's designated expert, speaks for plaintiff on the issue she was retained to address, *see Rawers v. United States*, 488 F. Supp. 3d 1059, 1084 n.29 (D.N.M. 2020); plaintiff herself furnished the records on which Dr. Scuderi relied; and the record contains no expert opinion that the VA breached the standard of care under plaintiff's version of events. [Dkt. 169 at 3-5].

Plaintiff argues Dr. Scuderi's conclusion answers a conditional question: if NP Salmon called plaintiff and sent the letter documented in the chart, verbal and written notice within seven days met the standard of care. Because plaintiff denies either communication occurred, and NP Salmon could not verify mailing or receipt, plaintiff contends the predicate is genuinely disputed and cannot be resolved by treating the chart as true and her sworn testimony as false. Plaintiff further contends expert testimony supplies the professional standard—including Dr. Scuderi's testimony that the ordering provider had an independent duty to notify the patient—

and the factfinder must then determine whether the VA performed that duty, which requires no new or supplemental expert opinion. [Dkt. 164 at 11-12 & n.3].

The Court agrees with plaintiff. As with SJMC's motion, the difficulty lies not in the legal rule the Government invokes but in the nature of the opinion on which it relies. Dr. Scuderi did not opine the VA's notification practices were adequate regardless of whether plaintiff was actually notified. She opined "[v]erbal and written notification of abnormal screening mammography results to the patient within seven days meets or exceeds the standard of care," based on the documented May 7 telephone encounter and follow-up letter. [Dkt. 119-2 at 9]. Her deposition confirms the premise: her conclusion rested on NP Salmon's chart entry, and she expressly disclaimed any opinion on the evidence contradicting it. [Dkt. 155-10 at 9-10 (109:14-110:4)].

Dr. Scuderi's testimony thus does two distinct things. It identifies the professional standard—timely verbal and written notification of an abnormal result and the need for further imaging—and it applies that standard to a factual premise she accepted from the chart without independent assessment. The first is expert testimony on a matter outside ordinary experience; the second is not. Whether NP Salmon telephoned plaintiff on May 7, 2021, and whether the letter documenting the call was sent, are historical facts on which the record is in conflict: NP Salmon's chart entry and letter on one side and, on the other, plaintiff's sworn denial, her testimony that her telephone records and a contemporaneous recording support her account, and NP Salmon's inability to verify mailing or receipt. [Dkt. 155, ¶¶ 3, 24; Dkt. 164,

¶¶ 3, 24]. Resolving that conflict requires credibility determinations the Court may not make at this stage. *Tolan*, 572 U.S. at 656-57.

Nor does the absence of an expert opinion premised on plaintiff's version of events entitle the Government to judgment. For purposes of its motion, the Government does not contest the VA owed plaintiff a duty to notify her of her abnormal results, [Dkt. 155 at 11], and plaintiff identifies testimony from Dr. Scuderi that the ordering provider had an independent duty to notify the patient, [Dkt. 164, ¶ 50]. Plaintiff does not contend the VA notified her in a manner or within a timeframe whose adequacy requires expert evaluation; she contends the VA did not notify her at all. If the factfinder credits her account, no additional expertise is needed to determine whether the VA failed to perform the expert-defined duty to notify. Expert testimony is required when a question lies beyond "the realm of ordinary experience of mankind," *Strubhart*, 903 P.2d at 274, but not to determine whether a telephone call was placed or a letter was mailed. Plaintiff's position rests not on speculation or "metaphysical doubt," *Matsushita*, 475 U.S. at 586, but on sworn testimony based on personal knowledge, *see Greer*, 943 F.3d at 1325.

The Government's remaining arguments do not alter this conclusion. Even accepting that an expert may speak for the designating party on the subject for which she was retained, *see Rawers*, 488 F. Supp. 3d at 1084 n.29, Dr. Scuderi expressly conditioned her opinion on the chart notation and offered "no opinion" on evidence contradicting it. Treating this conditional assessment as plaintiff's concession that notification occurred would bind plaintiff to a factual premise her expert expressly

declined to evaluate. Nor did plaintiff, by furnishing the VA's records to her expert, vouch for the accuracy of every entry. Finally, *Cohlmia* and Rule 26(a)(2)(B)(i) govern the scope of an expert's admissible testimony; they do not prevent a party from disputing a fact on which her expert relied. Plaintiff offers no new or supplemental expert opinion in opposing summary judgment. Instead, she relies on her own testimony and Dr. Scuderi's opinions as disclosed. Any objection to testimony exceeding the scope of that disclosure is an evidentiary matter for trial, not a basis for summary judgment.

**2. Causation and Damages**

The Government next argues that, even if plaintiff could establish a breach of the notification standard, she lacks expert testimony establishing damages proximately caused by that breach. Where injuries "are of such character as to require skilled and professional men to determine the cause and extent thereof, the question is one of science, and must necessarily be determined from the testimony of skilled professional persons[.]" *Howard v. Mansell*, 430 P.2d 9, 10 (Okla. 1967). Based on Dr. Scuderi's timeline, the Government calculates the standard of care required diagnosis by approximately July 7, 2021, followed by surgery four to eight weeks later, between August 7 and September 7, 2021. It argues that Dr. Papish's opinions cannot establish damages because he compared plaintiff's actual outcome only with a projected outcome of surgery in April or May 2021—an allegedly irrelevant timeline—and offered no assessment of surgery in July, August, or September 2021. [Dkt. 155 at 12-14]. The Government further contends the acceptable three-month timeline

imposed no duty to secure an earlier diagnosis; Dr. Scuderi's June 2021 estimate assumed the expedited 2022 sequence, which depended on community resources possibly unavailable in 2021; and a lay factfinder cannot infer plaintiff's medical condition at a date for which no expert has offered an opinion. [Dkt. 169 at 10-11].

In plaintiff's view, the Government converts Dr. Scuderi's approximate, resource-dependent estimates into fixed waiting periods that must run consecutively. She emphasizes that Dr. Papish did not assume surgery on the date of the mammogram but several weeks later, near "the end of May, or somewhere in that range"; that Dr. Scuderi, applying the actual sequence of care, testified diagnosis likely would have occurred in June 2021; and that a defense expert uses a July 2021 diagnosis date and acknowledges prognosis may be affected by tumor size and lymph-node involvement. [Dkt. 164 at 14-15]. Plaintiff argues the Government confuses uncertainty about the precise extent of harm with an absence of causation, and she invokes *McKellips* for the proposition that Oklahoma law does not require proof that timely care would have guaranteed a better outcome. [*Id.* at 15].

The Government's argument has force, and plaintiff will bear the burden at trial of proving, through competent expert testimony, that the defendants' negligence more probably than not caused her claimed injuries. *McKellips*, 741 P.2d 467. At the summary judgment stage, however, the argument fails for three reasons.

**First**, the argument conflates the standard of care with causation. Plaintiff does not contend the standard of care required a diagnosis within some period shorter than three months. She contends defendants breached the standard of care by failing

to notify her of her abnormal results and, absent those breaches, she would have been diagnosed and treated earlier than she was. The causation inquiry therefore asks when, more probably than not, plaintiff would have been diagnosed and treated had defendants exercised due care. Dr. Scuderi's three-month estimate is evidence on that question, but so is her testimony that plaintiff most likely would have been diagnosed in June 2021, as is Dr. Papish's testimony placing the earlier surgery near the end of May 2021 or "somewhere in that range." *See* [Dkt. 164, ¶¶ 39-40, 43]. The weight to be given that testimony, including the caveats the Government identifies, is for the factfinder. *Tolan*, 572 U.S. at 656-57.

**Second**, the Government's timeline is itself built on inferences drawn in its favor. It treats each of Dr. Scuderi's approximate intervals as running consecutively at or near its outer limit, and it asks the Court to infer that the resources permitting same-day diagnostic imaging and biopsy in January 2022 would not have been available in 2021. [Dkt. 169 at 7-8]. The record also contains evidence supporting a later timeline, including NP Salmon's letter deferring diagnostic imaging to early July to accommodate plaintiff's COVID-19 vaccination, which Dr. Scuderi's report characterizes as consistent with the standard of care. [Dkt. 119-2 at 10-11]. Competing evidence on the counterfactual timeline is the hallmark of a factual dispute, not the absence of one, and Rule 56 does not permit the Court to choose between those timelines or to draw inferences in favor of the moving party. *Tolan*, 572 U.S. at 657.

**Third**, even accepting a later counterfactual date, the record contains expert

evidence from which a factfinder could conclude the delay caused harm. Under every timeline the parties propose, plaintiff's surgery would have occurred months before March 30, 2022. Dr. Papish testified plaintiff's tumor continued to grow throughout the delay and opined, to a reasonable degree of medical certainty, that earlier treatment would have involved a smaller tumor, fewer involved lymph nodes, a higher estimated survival rate, and a reduced likelihood of axillary radiation. *See* [Dkt. 164, ¶¶ 34, 36, 40]. Plaintiff also identifies a defense expert's acknowledgement that tumor size and lymph-node involvement may affect prognosis. *See* [*id*. at ¶ 59]. The Government is correct that a factfinder may not speculate about plaintiff's medical condition at a date for which no expert has offered an opinion, *see Howard*, 430 P.2d at 11, but the Court cannot conclude on this record that a finding of causation would require such speculation. The extent to which the harm Dr. Papish describes is attributable to the period of delay the factfinder ultimately attributes to defendants' negligence bears on the amount of plaintiff's damages and the weight of his expert testimony—matters the Government may test through cross-examination and its own expert evidence.[15]

At bottom, the Government contends Dr. Papish's quantified conclusions rest on an assumed surgery unsupported by the record. That contention challenges whether his testimony "is based on sufficient facts or data" and "reflects a reliable

[15] Because the record presents a genuine dispute under traditional causation principles, the Court need not decide whether or to what extent the loss-of-chance doctrine recognized in *McKellips* applies to plaintiff's claim. *See* 741 P.2d at 467 (limiting the doctrine to a narrow class of cases and holding that, where it applies, testimony that the patient's chances would have been significantly improved suffices to present causation to the factfinder without a precise percentage).

application of the principles and methods to the facts of the case," Fed. R. Evid. 702(b), (d), the same issues raised in the Government's pending motion to exclude his opinions in their entirety, *see* [Dkt. 151]. The Court will address the fit between Dr. Papish's assumptions and the record when ruling on that motion and will not duplicate that analysis here. Because plaintiff's claim against the Government will be tried to the Court, the Court will also be well positioned to assess the foundation and weight of any admitted opinions after hearing his testimony. In a bench trial, "while *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). And if plaintiff fails at trial to present competent evidence linking her claimed injuries to the Government's conduct, the Government may seek judgment on partial findings under Fed. R. Civ. P. 52(c). Accordingly, the Government is not entitled to summary judgment on plaintiff's claim that the VA failed to notify her of her abnormal screening results.

### B. POST-NOTIFICATION ACTS AND OMISSIONS

The Government's second proposition is expressly conditional: to the extent the Court denies its partial motion to dismiss for lack of subject-matter jurisdiction, it argues plaintiff cannot establish damages proximately caused by a post-notification act or omission. A federal court must assure itself of its jurisdiction before reaching the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Having done so in denying the Government's dismissal motion, the Court now reaches the merits of the second proposition.

The Government argues that, although Dr. Scuderi "pivoted" at her deposition to opine post-notification conduct breached the standard of care, she offered no testimony on how those breaches affected the date of diagnosis or surgery, and Dr. Papish offers no opinion on their effect. Because Dr. Papish's damages opinions assume an April or May 2021 surgery, and no post-notification conduct could have caused the loss of a surgery in that period—or, at the least, any surgery before July 2021—the Government contends plaintiff cannot establish damages proximately caused by that conduct. [Dkt. 155 at 14-16]. Plaintiff asserts Dr. Scuderi's report identified each challenged event and its contribution to the delay in diagnosis; her deposition testimony explained, rather than changed, those opinions; the FTCA measures the Government's liability against Oklahoma's community standard rather than internal VA policy, *see* 28 U.S.C. §§ 1346(b)(1), 2674; *Olson*, 546 U.S. at 44-46; and the Government's own expert agrees multiple scheduling delays, taken together, resulted in a delayed diagnosis. [Dkt. 164 at 12-13].

The Government's second proposition rests on the same premise as its first: Dr. Papish's opinions are relevant only to an April or May 2021 surgery and therefore cannot establish harm from any later breach. The Court has rejected that premise for the reasons already explained. The Government is correct that conduct occurring after May 2021 could not have caused plaintiff to lose the opportunity for surgery in late May 2021, and plaintiff will bear the burden at trial of presenting competent evidence linking her claimed harm to the specific post-notification conduct on which she relies. Plaintiff's theory, however, is that a series of failures by the VA, by SJMC,

or both contributed to a single, continuing delay in diagnosis. Under Oklahoma law, "[w]here several causes producing an injury are concurrent and each is an efficient cause without which the injury would not have happened, the injury may be attributed to all or any of the causes." *Green v. Sellers*, 413 P.2d 522, 528 (Okla. 1966). Dr. Scuderi's report describes each identified post-notification action as "contributory" to the delay in diagnostic imaging and, ultimately, the timely diagnosis of breast cancer, [Dkt. 119-2 at 11-12], and Dr. Papish testified the tumor continued to grow throughout the delay, *see* [Dkt. 164, ¶ 40]. Whether and to what extent each post-notification act or omission caused plaintiff's claimed injuries, and how responsibility should be allocated among the VA, SJMC, and plaintiff herself, remain questions of fact for trial.

The remaining disputes concern admissibility rather than the existence of a genuine issue of material fact. Whether Dr. Scuderi's testimony about post-notification conduct elaborates on opinions disclosed in her report or offers new opinions, *see* [Dkt. 155, ¶¶ 28-32], is governed by Fed. R. Civ. P. 26(a)(2)(B) and 37(c)(1) and the *Woodworker's Supply* factors; it does not provide a basis for summary judgment. To the extent the pending motions in limine concerning undisclosed theories and expert testimony do not resolve that issue, the Government may raise it by objection at trial. Likewise, the Court will address the reliability and fit of Dr. Papish's opinions as applied to any later counterfactual date when ruling on the Government's motion to exclude. Because genuine disputes of material fact remain as to breach and causation, the Government's motion is denied.

## VI. CONCLUSION

IT IS THEREFORE ORDERED that SJMC's motion for summary judgment [Dkt. 153] is hereby **DENIED**.

IT IS FURTHER ORDERED that the Government's motion for summary judgment [Dkt. 155] is hereby **DENIED**.

IT IS SO ORDERED on this 21st day of October, 2026.

JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE